**BARRY AVIATION, INC., Plaintiff,**

v.

**LAND O'LAKES MUNICIPAL AIR-PORT COMMISSION, Town of Land O'Lakes Wisconsin, Richard Peterson, Henry Mitchell, Michael Stopczynski, Ronald Ramesh, Karl Kersher and James A. Bates. Defendant.**

No. 02C635C.

United States District Court, W.D. Wisconsin.

April 25, 2005.

Robert W. McIntyre, Cleveland, OH, for Plaintiff.

James A. Johnson, Johnson & Houlihan, S.C., Rhinelander, WI, for Defendants.

## OPINION AND ORDER

CRABB, District Judge.

This is a civil action for monetary damages in which plaintiff Barry Aviation, Inc. contends that defendants fraudulently induced it to enter a contract to become a fixed-base operator at the Land O'Lakes Municipal Airport by misrepresenting the number of annual aircraft landings and takeoffs by over 2,000%. Plaintiff contends that in so doing, defendants (1) violated the Wisconsin Organized Crime Control Act, Wis. Stat. § 946.83; (2) violated the Racketeer Influenced and Corrupt Organizations Act (RICO) 18 U.S.C. § 1961; (3) committed common law fraud; (4) engaged in a civil conspiracy to commit fraud; (5) violated plaintiff's constitutional due process and equal protection rights; and (6) breached the parties' contract.

Shortly after plaintiff filed this case in November 2002, defendants moved to dismiss the complaint, arguing among other things that plaintiff had not pleaded its claims of fraud with particularity as required under Fed.R.Civ.P. 9(b). In an order dated May 14, 2003, I agreed with defendants and dismissed plaintiff's federal fraud claims. In addition, I held that even if plaintiff had satisfied the Rule 9(b) particularity requirement, its allegations failed to make out actionable claims under 42 U.S.C. § 1983 or RICO. Because plaintiff had not established diversity jurisdiction, I dismissed its state law claims for lack of jurisdiction. Finally, I denied plaintiff leave to amend because it appeared clear from the complaint that the four-year statute of limitations for plaintiff's RICO claim had expired in 1997 and the six-year limitations period for plaintiff's § 1983 claim had expired in 1999.

On appeal, the Court of Appeals for the Seventh Circuit held that it was error to deny plaintiff leave to amend, reasoning that the allegations in the complaint did

not foreclose entirely the possibility that the pertinent statutes of limitations had not run. *Barry Aviation Inc. v. Land O'Lakes Municipal Airport Commission,* 377 F.3d 682, 688–90 (7th Cir.2004). Noting that the period for filing actions under RICO and § 1983 begins to run when the plaintiff knew or should have known it sustained an injury, the court held that the complaint could be fairly read as alleging that plaintiff became aware of its disappointing business levels only gradually. *Id.* at 688. In addition, the court held that the doctrine of equitable estoppel might apply because plaintiff alleged that defendants had provided plaintiff with fraudulent documents misrepresenting the number of aircraft takeoffs and landings. *Id.* at 689.

On October 5, 2004, plaintiff filed its first amended complaint. In response, defendants filed a motion to dismiss. Instead of defending its first amended complaint, plaintiff filed a motion for leave to file a second amended complaint, which I granted while expressing reservations about plaintiff's ability to make out a claim against defendant. Again, defendant moved to dismiss, arguing that plaintiff's second amended complaint suffered from a variety of pleading and jurisdictional problems. This motion is now before the court, as is plaintiff's motion for oral argument.

Plaintiff's motion for oral argument will be denied. Although plaintiff suggests that oral argument would allow the court to clear up any questions arising from the parties' lengthy briefs on the complex issues raised in defendants' motion, I do not believe it is necessary. The parties have presented the issues in this case in their briefs; neither side suggests that any particular issue needs further development or could not be developed fully on paper.

Plaintiff's RICO claim must be dismissed because plaintiff has not alleged two predicate acts of mail or wire fraud with particularity. As for the § 1983 claims, plaintiff's allegations do not implicate the equal protection clause and the availability of meaningful state law remedies dooms its due process claim. With the dismissal of all of plaintiff's federal claims, I will decline to exercise supplemental jurisdiction over plaintiff's state law claims. It is true that those claims have been pending in this court for two years, but no judicial resources have been expended in considering their merits and § 1367(d) provides for tolling of the applicable statutes of limitations in state courts for closely related claims. Finally, I will deny plaintiff leave to amend. Plaintiff has had three opportunities over the course of several years to allege a federal claim. Furthermore, plaintiff has shown through its pleadings and briefs that it does not appreciate its obligation to conduct a pre-filing investigation when bringing claims of fraud. Thus, it is doubtful that plaintiff would expend the necessary effort to state a claim of fraud if given a fourth opportunity to plead.

▮ Before setting out the factual allegations, I will address the parties' dispute regarding the effect of the exhibits plaintiff attached to its second amended complaint. Generally, exhibits attached to a pleading are treated as part of the pleading for all intensive purposes. Fed. R.Civ.P. 10(c). Although courts do not presume that a plaintiff means to adopt every word in its exhibits, attachments trump contradictory allegations. *Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend,* 163 F.3d 449, 454 (7th Cir.1998).

In its second amended complaint, plaintiff alleged that it had attached as Exhibit C a certain petition defendants filed with the Wisconsin Department of Transportation and the Federal Aviation Administra-

tion in 1993, which incorporated a document entitled "Airport Master Record," allegedly containing flight information for the 13 months ending in September 1991. A review of Exhibit C shows that it contains 12 pages, only two of which are clearly part of the petition described in the complaint. The first five pages of exhibit C appear to be a report drafted by the Wisconsin Department of Transportation in response to the petition; the sixth page is a map of the airport entitled "Project Statement Sketch," is dated January 3, 1994 which would be after the petition was allegedly filed; the seventh page is the Wisconsin DOT routing memo for the petition; the eighth page is labeled "Airport Master Record" but contains flight information for 12 months ending in September 1991; page nine is another document prepared by the Wisconsin DOT entitled "Tentative Six–Year Airport Improvement Program"; page ten is a duplicate of page eight; and finally, pages eleven and twelve appear to be the petition plaintiff referred to in its allegation, although there is no indication on either page that the petition incorporates the "Airport Master Record."

Citing the rule that attachments may negate contradictory allegations, defendants argue that exhibit C shows that the "Airport Master Record" was not incorporated in the petition that was sent to the state and federal government. Defendants' reading of the rule overstates its effect in this instance. Exhibit C does not prove that the master record was not incorporated in the petition. At most, it raises the possibility that it was not.

The significance of the ambiguous document lies in its effect upon plaintiff's claim that the transmittal of the petition constitutes mail or wire fraud. To support that claim, plaintiff must identify the content of the petition with particularity, to show that it contained fraudulent misrepresentations.

Fed.R.Civ.P. 9(b). The jumbled state of exhibit C raises a serious question about the actual content of the allegedly fraudulent petition. Not only has plaintiff failed to identify the petition with precision, it has made no attempt to defend the allegation in the second amended complaint that the Airport Master Record was made part of the petition. *Kennedy v. Venrock Associates,* 348 F.3d 584, 594 (7th Cir.2003) (A party may "make a concession in his brief that showed that his case has no merit, though that might not have been apparent from the complaint . . . .") (citing *Harrell v. United States,* 13 F.3d 232, 235–36 (7th Cir.1993)). On this record, I find that plaintiff has identified only the last two pages of exhibit C as being part of the petition.

In its complaint, plaintiff makes the following allegations of fact.

## ALLEGATIONS OF FACT

### A. *The Parties*

Plaintiff Barry Aviation, Inc. is a Wisconsin corporation with its principal place of business in West Palm Beach, Florida. Defendant Land O'Lakes Municipal Airport Commission is a public commission established under Wisconsin law for the exclusive purpose of governing, administering and managing the municipal airport. Defendant Town of Land O'Lakes is a municipality in Vilas County, Wisconsin. Defendant Richard Peterson "was/is the Town Chairman and/or a member of [defendant] Commission during certain time periods." Defendants Henry Mitchell, Michael Stopczynski Sr., Ronald Ramesh and James A. Bates either were or are members of defendant Commission. Defendant Karl Kerscher either was or is a member of defendant Commission, the manager of the municipal airport and the designated agent of defendants Town and Commission.

Tim and Patti Barry, plaintiff's sole owners, own a vacation property in Michigan near the town of Land O'Lakes. In 1992, they began investigating a business opportunity to act as a fixed base operator at a regional airport. Generally, fixed base operators provide aircraft sales, rentals, charters, repair, fuel and storage at public airports. The Barrys focused their investigation on public airports in north central Wisconsin and the adjacent regions of Michigan's Upper Peninsula. During the investigation, Tim Barry met defendant Kerscher at a public airport in Eagle River, Wisconsin. Defendant Kerscher said that he was a member of defendant Commission and the manager of the Land O'Lakes municipal airport and urged Barry to consider establishing an exclusive fixed base operation there. Defendant Kerscher told Barry that the Land O'Lakes airport was going to be expanded in anticipation of increased traffic levels, previously had been a commercial facility and was a better growth opportunity than the other municipal airports plaintiff was investigating.

## B. *March 10 Meeting*

On March 10, 1993, Barry attended a public meeting of defendant Town at which the town disclosed its plans to petition the Wisconsin Department of Transportation and the Federal Aviation Administration for money to be used for development projects at the municipal airport. Defendants Kerscher, Ramesh, Peterson and Stopczyski were present. Before the meeting began, defendant Kerscher (the airport manager) gave Barry a document describing the airport and its future expansion plans "on behalf of and as agent of the other Defendants."

During the discussion of the plan to petition the state and federal government for funding, defendant Kerscher said that such funding was needed and that it would have a positive economic impact on the area. In addition, he indicated that there had been 8,500 takeoffs and landings at the airport in the preceding year. Defendant Kerscher explained the application process and proposed a petition. Barry reviewed this petition both before and after the meeting. Defendant Kerscher presented the "Airport Master Record," which he identified as the FAA's official record of takeoffs and landings at the municipal airport for the 13 months ending in September 1991.

Before, during and after the meeting, defendants Town, Kerscher, Ramesh, Stopczynski and Peterson represented to plaintiff that they had plans for substantial redevelopment projects at the airport that would be paid for with fees from existing use, that the airport had in excess of 10,000 FAA-defined operations each year (FAA operations are defined as aircraft arrivals and departures), that the information in the petition was truthful and accurate and that the "Airport Master Record" was compiled by the FAA from submissions defendant Kerscher made on behalf of the town using the official airport operation records.

At the time they made these representations to Barry, defendants Town, Kerscher, Ramesh, Stopczynski and Peterson knew "(1) that the official report of operations in excess of 10,000 per year was materially false and fraudulent; (2) that the materials submitted to the FAA and WDOT by [defendant] Kerscher were materially false and untrue; (3) that these material misrepresentations were made to the State and Federal governments for the purpose of obtaining public funds; and (4) that plaintiff was relying upon the statements and documents [they provided him before, during and after the meeting]" in deciding whether to enter a contract with

defendant Town to establish a fixed base operation at the airport.

### C. *The Fixed Base Operations Contract*

On June 15, 1993, plaintiff entered into a public contract with defendant Town under which plaintiff was to serve as a fixed base operator at the municipal airport for twenty years. In doing so, plaintiff relied on the representations made by defendant Kersher and the town's lawyer, John La-Chance, and "ratified by" defendants Peterson, Mitchell, Stopczynski and Ramesh.

Pursuant to its contractual obligations, plaintiff made substantial investments it anticipated recovering over the life of the contract. It hired mechanics, flight instructors and other personnel, purchased 18 airplanes, renovated the fixed base operations center and hangar, established an aircraft maintenance facility, a flight school and fuel sales operations and provided aircraft sales, charters, and rentals. Its total investments exceeded $1,500,000. Tim and Patti Barry moved to the area permanently in order to manage and operate the business on a full-time basis.

### D. *Low Levels of Business Activity*

Despite plaintiff's investments, "the level of business plaintiff experienced at the Airport in the period of late 1994 through July 1999 was less than what defendants Kerscher, Ramesh, Peterson, Stopczynski, and Town had officially represented to Plaintiff in detail before, during, and after the March 10, 1993 public meeting and by many of the documents Barry was provided by the Town and other defendants referenced previously, as described above." (Plaintiff did not allege in its complaint that these defendants made any representations about what level of business plaintiff would experience in the future. Instead, plaintiff alleged that they had represented the level of activity at the airport in the past. I will assume that plaintiff meant to allege that the level of business it experienced was less than it had reasonably expected from defendants' representations about the past level of activity at the airport.)

Plaintiff brought its concerns regarding the low level of business to the attention of defendants Kerscher, Town, Commission, Peterson, Mitchell, Stopczynski, Ramesh, and Bates at various times between late 1994 and July 1999 and raised the issue with defendants Town, Kerscher and Mitchell almost every month during this time.

On January 9, 1997, December 8, 1998 and March 2, 1999, Barry attended business meetings of defendant Commission at which he discussed the disappointing level of business that plaintiff was experiencing. At the January 9, 1997 meeting, defendant Kerscher "represented" that the condemnation of defendant Town's fuel tank system was the reason for the low business levels. Defendants Town, Commission and Kerscher "discussed, represented, and ratified" the justification for the projects described in the 1993 petition. At the December 8, 1998 meeting, defendants Town, Commission and Bates told plaintiff that "the condemnation of the Town's fuel tank system and the lack of fuel availability" were the reasons for low levels of airport traffic. At the March 2, 1999 meeting, someone again offered the condemnation of the fuel tank to explain the low level of activity at the airport. Defendants Town, Commission, Peterson and Bates "discussed and ratified" the "continuation and justification of the project described in the 1993 [p]etition." At each of these three meetings, the defendants in attendance represented to plaintiff that the FAA operations numbers provided in the 1993 petition were accurate and that plaintiff could and should rely on them.

On July 17, 1999, Barry attended a public meeting of defendant Commission at which the subjects of fuel unavailability and the continued execution of the projects described by the 1993 petition were discussed. During the meeting, defendants Commission, Kerscher and Bates represented that the 1993 petition was true and accurate.

At the meetings on January 9, 1997 and July 17, 1999, defendant Kerscher assured plaintiff that state and federal applications for additional funding "had been made" and that the relevant state and federal agencies would approve them "based on the 1991–1997 operations levels which were certified by Defendant Kerscher and Town in 1991, 1993 and 1999 to continue at the 10,000(+) per year level." "[E]specially at the meetings on January 9, 1997 and July 17, 1999," defendant Kerscher represented to Barry that the low level of business that plaintiff was experiencing was caused by plaintiff's actions or inactions, method of operation and personnel and by local customers' lack of familiarity with Barry. (Plaintiff's allegations do not suggest that Barry and Kerscher were both present at any commission meetings other than the ones on January 9, 1997 and July 17, 1999.)

### E. *The 1999 Petition*

On July 28, 1999, defendants Town, Commission, Kerscher and Bates "authorize[d], execute[d], and ratif[ied]" a petition entitled "Eligibility Statement for Petition Dated July 28, 1999" for the purpose of obtaining more public funds for the expansion and enhancement of the airport. The following day, defendants Town, Commission, Kerscher, and Bates provided plaintiff with a copy of this petition, which they represented to be true and accurate. In the petition, defendants stated explicitly that there were 11,200 officially reported aircraft operations at the municipal airport in the 12–month period ending August 1997. Defendants Town, Commission, Kerscher and Bates knew at the time that these numbers were false.

Earlier, at the July 17, 1999 meeting, defendants Commission, Kerscher and Bates had represented to Barry that the FAA operations numbers set forth in the 1999 petition were true and accurate and that plaintiff could and should rely upon these numbers to continue its fixed base operations and fulfill its obligations under the parties' contract. (I will assume that the 1999 petition had been drafted as of July 17, 1999, even though it was not ratified until July 28, 1999.)

(From plaintiff's allegation that "[a]s a result of the foregoing, [defendant] Town has fraudulently obtained some of the funding requested in the foregoing applications for the Airport," I will infer an allegation that both the Wisconsin Department of Transportation and the Federal Aviation Administration approved the 1993 and 1999 petitions.)

### F. *Document Discovery*

In November 2000, Barry attended a town meeting at which he asked LaChance and defendants Kerscher and Peterson for defendant Town's public records upon which the "FAA and WDOT submissions" were based. None of the three responded to his request. Later that month, while cleaning a room in the basement of the airport's terminal building that previously had been under the exclusive lock-and-key control of defendant Town, plaintiff discovered an unmarked file cabinet containing the actual, official airport records from 1985 through 2000. These records included the original operations log that had been kept by defendants Town, Commission, Kersher and "other commissioners named as defendants herein," copies of the 1993 and 1999 petitions and other correspondence with state and federal authori-

ties. (Plaintiff's reference to "other commissioners named as defendants herein" is curious because I cannot find any reference to any defendant other than Kerscher who served as the airport's commissioner.) The records showed that the operation numbers in the 1993 and 1999 petitions exceeded the actual operations numbers by 2000%.

Plaintiff informed LaChance and defendants Commission and Peterson that he had discovered these records. Barry made photocopies of the original operations logs and some of the other materials it found before delivering them to LaChance. At some point in the spring of 2001 after defendant Kerscher resumed his position as airport commissioner, someone removed from the terminal the contents of the file cabinet "excepting possibly the materials copied and returned by [p]laintiff to [ ] LaChance, counsel for Defendants Town and Commission." On June 16, 2003, Dan O'Brien, a former airport manager, told Barry that defendant Kerscher had directed him and another airport employee, Dave Lane, to move the file cabinet and its contents to the garage portion of defendant Kerscher's private hangar and that O'Brien and Lane had done so in the presence of defendants Kerscher and Bates.

## OPINION

### A. *Racketeer Influenced Corrupt Organizations Act*

The Racketeer Influenced Corrupt Organizations Act (RICO) includes both criminal and civil enforcement mechanisms. 18 U.S.C. § 1964(b)and (c). The civil enforcement provision provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor" in federal district court. 18 U.S.C. § 1964(c). Section 1962 provides as follows:

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce [with one exception not relevant to this case].

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

As defendants noted in their brief in support of their motion to dismiss, plaintiff did not indicate the subsection on which it was relying for its RICO claim. Because some of the language in plaintiff's complaint under the RICO count followed the language of subsection (c) of § 1962, defendants framed their argument on the

assumption that plaintiff's RICO claim was premised on subsection (c). In response, plaintiff stated that its RICO claim is not limited to subsection (c) but did not say what other subsections it believed were applicable or why. Although plaintiff failed to invoke subsection (d), the second amended complaint contains multiple allegations of conspiracy to defraud, a point defendant acknowledged in its reply brief. Thus, I will review plaintiff's allegations for statement of a claim under sections (c) and (d). To the extent that plaintiff intended to pursue claims under subsections (a) and (b), it has waived those claims. *Central States, Southeast & Southwest Areas Pension Fund v. Midwest Motor Express, Inc.*, 181 F.3d 799, 808 (7th Cir. 1999) ("Arguments not developed in any meaningful way are waived."); *see also United States ex rel. Garst v. Lockheed–Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003) (judicial time is best spent "on those litigants who take the preliminary steps to assemble a comprehensible claim").

### 1. § 1962(c)

It is well settled that to state a claim under subsection 1962(c), a plaintiff must allege " '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.' " *Goren v. New Vision International, Inc.*, 156 F.3d 721, 727 (7th Cir.1998) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)). Generally, complaints are held to the liberal notice pleading standard set out in Fed.R.Civ.P. 8(a). However, Fed.R.Civ.P. 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Rule 9(b) applies to allegations of fraud in a civil RICO claim, *Lachmund v. ADM Investor Services, Inc.*, 191 F.3d 777, 782 (7th Cir.1999); *Goren*, 156 F.3d at 726, but not to its non-fraud elements, *Freeport Transit, Inc. v. McNulty*, 239 F.Supp.2d 102, 109 (D.Me.2003) (citing *New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 289 (1st Cir.1987)); *Preway Inc. v. Touche Ross & Co.*, 1986 WL 69193, at *5–7 (W.D.Wis. Mar. 24, 1986); *see also Kennedy v. Venrock Associates*, 348 F.3d 584, 593 (7th Cir.2003) ("Rule 9(b) is strictly construed; it applies to fraud and mistake and nothing else.") (citing *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993)).

### a. Failure to allege two predicate acts of racketeering with particularity

Defendants' most substantial argument is that plaintiff failed to allege with particularity facts showing a pattern of racketeering. A "pattern of racketeering activity" "requires at least two acts of racketeering activity," 18 U.S.C. § 1961(5); Such acts may encompass any one of the more than forty state and federal law felonies listed in 18 U.S.C. § 1961(1). In the May 14, 2003 order dismissing plaintiff's first complaint, I held that plaintiff had failed to point to a single federal statute enumerated in this list that provided a link to plaintiff's asserted predicate acts. In its second amended complaint, plaintiff has added allegations implicating mail and wire fraud. However, as defendants argue, these allegations fail to satisfy the particularity requirements of Rule 9(b). Although it is not necessary for a plaintiff to plead every element of a RICO claim with particularity, it is necessary to do so with respect to allegations of wire and mail fraud. *Corley v. Rosewood Care Center, Inc.*, 142 F.3d 1041, 1050 (7th Cir.1998).

In support of its mail fraud claim, plaintiff alleged as follows:

As part of their pattern of racketeering activity and separate and related schemes to defraud Plaintiff, the FAA, and the WDOT as described above, Defendants utilized the U.S. mail and/or private/commercial interstate carriers in violation of 18 U.S.C. § 1341, including, but not limited to: (a) transmitting the 1993 Petition to the WDOT and FAA, (b) transmitting the 1999 Petition to the WDOT and FAA, (c) transmitting the operations data to the FAA in 1991, (d) transmitting the operations data to the WDOT and FAA in 1993, (e) transmitting the operations data to the FAA in 1997, (f) transmitting the operations data to the WDOT and FAA in 1999, (g) transmitting to Barry written materials on at least two occasions between 1993 and 2001, and (h) communicating with Barry on more than two occasions between 1993 and 2001.

For the claim of wire fraud, plaintiff alleged that:

As part of their pattern of racketeering activity and 3 separate and related schemes to defraud Plaintiff, the FAA, and the WDOT as described above, Defendants utilized the interstate wires in violation of 18 U.S.C. § 1343 including, but not limited to: (a) transmitting the 1993 Petition to the WDOT and FAA, (b) transmitting the 1999 Petition to the WDOT and FAA, (c) transmitting the operations data to the FAA in 1991, (d) transmitting the operations data to the WDOT and FAA in 1993, (e) transmitting the operations data to the FAA in 1997, (f) transmitting the 28 operations data to the WDOT and FAA in 1999, (g) transmitting to Barry written materials on at least two occasions between 1993 and 2001, and (h) communicating with Barry on more than two occasions between 1993 and 2001.

To satisfy Rule 9(b)'s particularity requirements, plaintiff must allege "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated." *Slaney v. The International Amateur Athletic Federation*, 244 F.3d 580, 599 (7th Cir.2001); *see also Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir.1992). Moreover, because plaintiff must allege at least two predicate acts to satisfy the pattern element, it must be able to show the what, when, where and how of at least two racketeering activities. *Slaney*, 244 F.3d at 599; *Emery v. American General Finance, Inc.*, 134 F.3d 1321, 1323 (7th Cir.1998) ("in a RICO fraud case, [ ] the plaintiff needs to allege more than one fraud, and thus satisfy Rule 9(b) as it were twice").

█ Not one of the communications plaintiff lists meets all of the specificity requirements. First, plaintiff did not specify the method of communication with respect to any of them, leaving it unclear whether these communications were made by wire or by mail. Plaintiff alleges that each communication was made by "U.S. mail and/or private/commercial interstate carriers" without indicating which one. In addition, plaintiff alleges that each communication was made over interstate wires without specifying whether this means by telephone, fax, email, telegraph, etc.

Further, plaintiff fails to identify the persons mailing, faxing or telephoning these alleged misrepresentations. One might suspect that defendant Kerscher mailed or faxed the 1993 petition because he introduced the document at the March 10, 1993 meeting, made representations about its contents and was the airport manager at the time. However, this would be mere speculation. With respect to the 1999 petition, plaintiff alleges that defen-

dants Town, Commission, Kerscher and Bates "took official action to authorize, execute and ratify" the petition, but does not indicate which defendant mailed, faxed or emailed the petition to the Federal Aviation Administration and the Wisconsin Department of Transportation. *Cf.* 18 U.S.C. § 1341 (defining mail fraud as act of depositing or causing the deposit of certain material for delivery with postal service or private interstate carrier) and 18 U.S.C. § 1342 (defining wire fraud as act of transmitting or causing to be transmitted certain information over interstate wires). Finally, plaintiff does not say who mailed, faxed or emailed the 1993, 1997 and 1999 airport operations data to the FAA and WDOT or the unidentified "written materials" to Barry.

Moreover, plaintiff fails to specify the dates on which these communications were mailed or transmitted over interstate wires. *See, e.g.,* Plt.'s Br., dkt. # 83, at 8 ("Although Plaintiff did not have the precise date the 1993 information was sent to the FAA by the Town, it is obviously after July, 1993 and before January 1994 when the Project Statement was signed."); *id.* at 9 (1999 petition was sent at some time between July 28, 1999 and August 16, 1999 and 1997 operations data sent after July and before September 1999); *id.* at 10 ("[w]hile plaintiff might not have the exact date the [1997 operations data] was sent to the FAA, the document proves it was between 07/17/97 and 08/18/97"). As to the mailings to Barry, plaintiff alleges only that defendants transmitted written materials to Barry on at least two occasions "between 1993 and 2001" and communicated with him on "more than two occasions" during this time. Although it might be possible to infer a general time frame for some of these communications that would be sufficient for purposes of Rule 8(a), the pleading requirements for allegations of fraud demand more. *Lachmund,* 191 F.3d

at 784 (to satisfy Rule 9(b), allegations must include "specific times" alleged misrepresentations were made). As for the content requirement, plaintiff has not provided adequate information about the content of the mailings to the Wisconsin Department of Transportation or the Federal Aviation Administration or any information at all about the content of the "written materials" mailed, faxed or emailed to Barry by someone at some time between 1993 and 2001. Plaintiff has not identified the content of the other communications made to Barry between 1993 and 2001. Plaintiff has not explained how the mailings to the Wisconsin Department of Transportation and the Federal Aviation Administration advanced the scheme to defraud plaintiff. In addition, as I have already explained, it is not clear whether the 1993 petition included the "Airport Master Record."

b. Inability to obtain specific information without discovery

Plaintiff suggests that it was unable to make its allegations of mail and wire fraud any more specific because defendants have "stonewalled" discovery and that it has alleged as much as it can infer from the documents it already has. (In their reply brief, defendants note that plaintiff has not yet made any discovery requests.) It is true that "Rule 9(b) is satisfied by a showing that further particulars of the alleged fraud could not have been obtained without discovery." *Emery,* 134 F.3d at 1323. However, the rule does not help a party who has made no effort to show that it has been unable to procure the needed information through reasonable investigation. *Id.*

"The purpose [ ] of the heightened pleading requirement in fraud cases is to force the plaintiff to do more than the usual investigation before filing his complaint." *Ackerman v. Northwestern Mu-*

*tual Life Insurance Co.*, 172 F.3d 467, 469 (7th Cir.1999). This pre-complaint investigation must be of "sufficient depth to assure that the charge of fraud is responsible and supported" because charges of fraud "can do great harm to the reputation of a business firm or other enterprise[,] ... [are] frequently charged irresponsibly ... [and] frequently ask courts to rewrite the parties' contract or otherwise disrupt established relationships." *Id.* Insuring that fraud claims are well-founded is particularly important in the RICO context where the potential for recovering treble damages makes such claims strong leverage in settlement negotiations.

■ Plaintiff suggests that it is unable to meet the particularity requirement because defendants have hidden documents in defendant Kerscher's private hangar. However, the mail and wire fraud claims are premised on defendants' submissions to the Federal Aviation Administration and the Wisconsin Department of Corrections, not the actual operations logs that plaintiff found in the now missing file cabinet. Plaintiff does not suggest that it made any attempt to discover information about these submissions from the relevant government agencies; it could have made information requests from the Federal Aviation Administration under the Freedom of Information Act, 5 U.S.C. § 552, and from the Wisconsin Department of Transportation and defendant Town under the Wisconsin open records statute, Wis. Stat. §§ 19.21–19.39. Plaintiff suggests that requesting documents from defendant Town would have been futile, but I am not persuaded that it is reasonable to presume unlawful conduct on the part of a municipality, particularly in light of the minimal effort plaintiff would have had to make to confirm its suspicions. Moreover, plaintiff confirms that it has not made a pre-filing investigation by arguing that it has plead-

ed all it was able to infer from the documents it already had in its possession. In the absence of a showing that it made any attempt to obtain the missing information related to its mail and wire fraud claims, plaintiff is not entitled to rely on the relaxed standard. *Emery*, 134 F.3d at 1324.

c. Other "predicate acts" not listed

As a last ditch effort to save its RICO claim, plaintiff argues it alleged acts other than mail and wire fraud that might qualify as predicate RICO acts. In making this argument, plaintiff relies on *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016 (7th Cir.1992). As I noted in the opinion and order of May 14, 2003, the court of appeals held in *Midwest Grinding* that although telling a lie or committing perjury is not a RICO predicate act in and of itself, cover-up acts "theoretically may serve as predicate acts" *if* the plaintiff can show that the defendants' lies constituted mail fraud, wire fraud or obstruction of justice, which are enumerated predicate acts under RICO. Op. & Order, dkt. # 26, at 16 (citing *Midwest Grinding*, 976 F.2d at 1022). I rejected plaintiff's argument that it had "pleaded various violations of federal law including 'false and fictitious claims to the government' and 'embezzlement by a government employee'" because it had "fail[ed] to point to a single federal statute enumerated in RICO that provides the link to a predicate act of racketeering." *Id.*

Curiously, plaintiff argues again that in addition to pleading mail and wire fraud, it has pleaded various other "violations of federal and state law including but not limited to, false and fictitious claims to the government[s,] ... acts that ended up defrauding Plaintiff and both the Federal and State Government[,] ... conduct [that] resulted in the obstruction of justice, and a series of planned and successful frauds upon plaintiff and the Federal and

State Governments" and that these actions qualify as predicate acts. Plt.'s Br., dkt. # 83, at 14. Although obstruction of justice is a racketeering activity, 18 U.S.C. § 1961(1)(B), the term refers to interferences with court proceedings, 18 U.S.C. § 1503. Nothing in plaintiff's allegations suggest that any defendant engaged in interference with any court proceeding. Other than this baseless reference to obstruction of justice, plaintiff makes no attempt to show that any of the acts to which it is referring would rise to the level of a § 1961(1) predicate act.

 Although plaintiff has provided far more detail in its second amended complaint about the alleged misrepresentations defendants made to him at several town and commission meetings, the additional detail does not save the complaint. "Misrepresentations that occurred at a meeting do not constitute wire or mail fraud ... and thus could not constitute racketeering activity." *Tel–Phonic Services, Inc. v. TBS Intern., Inc.,* 975 F.2d 1134, 1139 (5th Cir.1992) (internal citations omitted). Acts of common law fraud do not constitute racketeering activity unless they implicate interstate mail or wire. *Fleet Credit Corp. v. Sion,* 893 F.2d 441, 445 (1st Cir.1990); *Bajorat v. Columbia–Breckenridge Development Corp.,* 944 F.Supp. 1371, 1379 (N.D.Ill.1996); *see also Midwest Grinding,* 976 F.2d at 1022 (RICO should not be used as "surrogate for garden variety fraud actions properly brought under state law"); *Jennings v. Emry,* 910 F.2d 1434, 1438 (7th Cir.1990) (various allegations of civil and constitutional rights not listed in § 1961 do not qualify as predicate acts under RICO). Without adequate pleading of mail and wire fraud or citation of any other predicate act of racketeering, plaintiff's complaint fails to state a claim under § 1962(c).

### 2. § 1962(d)

 To state a claim under subsection (d) of § 1962, a plaintiff must allege " 'facts indicating an agreement by the defendants as to which roles they would play in the enterprise' or any agreement by the defendants that someone would commit two specific predicate acts on behalf of the enterprise." *Lachmund,* 191 F.3d at 785 (quoting *Goren,* 156 F.3d at 732). Although plaintiff alleged that defendants "engaged in a conspiracy" to defraud the state and federal governments using interstate mail and wire, Plt.'s Second Am. Cpt., dkt. # 69, at 26, ¶¶ 85(f) and (g), it did not allege any facts indicating an act of agreement among defendants, what roles each defendant would play or what agreement defendants reached to commit two predicate acts of racketeering. A complaint lacking such factual allegations does not state a § 1962(d) claim. *Id.; see also Goren,* 156 F.3d at 733 ("vague and general allegations of a conspiracy" are insufficient). Accordingly, I will dismiss plaintiff's § 1962(d) claim.

### 3. Causation

Even if plaintiff had met the relevant pleading requirements, its claims flounder on the issue of causation. RICO's civil action provision allows suit by "[a]ny person injured in his business or property *by reason of* a violation of section 1962." 18 U.S.C. § 1964(c). In *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 267–68, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992), the Supreme Court held that this language required that the defendants' violation be a proximate cause of the plaintiff's injury. *See also Corley v. Rosewood Care Center, Inc. of Peoria,* 388 F.3d 990, 1005 (7th Cir.2004) ("This 'by reason of' language requires a showing of both 'but for' causation and proximate cause.") (cit-

ing *Holmes,* 503 U.S. at 268, 112 S.Ct. 1311). Attempting to provide some guidance as to the meaning of proximate cause, the Court noted that " '[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step.' " *Holmes,* 503 U.S. at 271, 112 S.Ct. 1311 (quoting *Associated General Contractors of Cal., Inc. v. California State Council of Carpenters,* 459 U.S. 519, 534, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)). Except for plaintiff's vague allegation that defendants transmitted unidentified written materials to Barry on two unspecified occasions between 1993 and 2001, plaintiff does not contend that it was the target of defendants' alleged acts of mail or wire fraud. (Because there is so little information identifying these two communications, no reasonable inference could be drawn that they contributed to plaintiff's alleged injuries).

 Instead, plaintiff's theory of causation is that it entered the fixed base operation contract in reliance on information contained in the 1993 petition and the Airport Master Record. Plaintiff contends that it would not have relied on the defendants' assertions about the number of take offs and landings at the airport had they not been included in "government documents." But the 1993 petition had not been mailed or faxed to the federal and state agencies at the time plaintiff decided to rely on it; nothing in plaintiff's second amended complaint suggests that it would not have entered the fixed base operation contract had defendants not actually transmitted the petition to the relevant governmental agencies. Plaintiff relied on defendants' representation that the petition would be submitted to the state and federal government; this representation is wholly separate from the allegedly fraudulent statements that might constitute mail or wire fraud.

Whether plaintiff's injuries could be said to have flowed from defendants' alleged conveyance of flight information to the Federal Aviation Administration, which incorporated the information into the Airport Master Record, presents a slightly closer question but does not save plaintiff's RICO claim. Even if I were to assume that the link between this communication and plaintiff's damages meets the requisite standard of proximity, this single predicate act does not constitute a pattern of racketeering. In *Marshall & Ilsley Trust Co. v. Pate,* 819 F.2d 806 (7th Cir.1987), an investor sued his financial advisor, alleging that the advisor had fraudulently induced him and others to invest in a limited partnership that fell apart shortly thereafter. The court held that a RICO plaintiff must prove a pattern of racketeering and an injury resulting from some or all of the activities constituting the violation but "need not prove that it suffered injury from each (or more than one) predicate act constituting the pattern." *Id.* at 810 In reaching this conclusion, the court reasoned that requiring a plaintiff to show direct injury resulting from every predicate act would conflate the questions whether there is a pattern of racketeering activity and whether the plaintiff was injured by a RICO violation.

The situation in *Pate* is materially different from the circumstances here. In *Pate,* the alleged predicate act was part of a pattern of racketeering at the time it caused the plaintiff's injury; in this case, plaintiff relied on the alleged misrepresentation before it became part of a pattern of racketeering. This distinction is critical because 18 U.S.C. § 1964(c) requires that the plaintiff's injury be caused "by reason of a violation of section 1962." When the alleged violation of § 1962 did not arise until after plaintiff's detrimental reliance, it cannot be said to have caused plaintiff's injury.

Although plaintiff did not raise the issue, I note that it could not establish causation for its conspiracy claim even if it could have shown that its injuries were caused by actions taken in furtherance of the alleged conspiracy even if the actions were not predicate acts. In *Schiffels v. Kemper Financial Services, Inc.*, 978 F.2d 344, 351 (7th Cir.1992), the court held that a plaintiff "has standing to sue under RICO if her complaint alleges an injury to her business or property proximately caused by an overt act in furtherance of a conspiracy to violate RICO, even though the overt act is not a predicate act required in a RICO pattern." However, the Supreme Court rejected this approach in *Beck v. Prupis*, 529 U.S. 494, 505, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000), holding that an "injury caused by an overt act that is not an act of racketeering or otherwise wrongful under RICO is not sufficient to give rise to a cause of action under § 1964(c) for a violation of § 1962(d)."

### B. *Section 1983*

Defendants argue that in addition to the failure to allege mail and wire fraud with particularity, plaintiff has not satisfied Rule 9(b)'s pleading requirements with respect to its claims that defendants made numerous fraudulent misrepresentations to Barry at various town and commission meetings that violated plaintiff's constitutional rights. Although I would tend to agree with plaintiff's assessment that its second amended complaint is reasonably specific as to the who, what, when, where and how of these alleged misrepresentations, it is unnecessary to decide this conclusively. Even if plaintiff alleged these instances of fraud, its allegations do not suggest a violation of a constitutional right.

### 1. *Equal protection*

In the May 14, 2003 opinion and order, I held that plaintiff had waived any equal protection claim it may have intended to make by failing to respond to defendants' arguments. In its second amended complaint, plaintiff invokes the equal protection clause again but does not explain why the facts it alleges would make out an equal protection claim. Plaintiff does not suggest that it is a member of a suspect class or that defendants have discriminated against it because of its membership in such a class. I must assume that if defendant has an equal protection claim at all, it is a "class of one" claim.

The Court of Appeals for the Seventh Circuit has articulated two standards by which a plaintiff can make out a class of one equal protection claim. *Crowley v. McKinney*, 400 F.3d 965, 972 (7th Cir. 2005) (citing *Tuffendsam v. Dearborn County Board of Health*, 385 F.3d 1124, 1127 (7th Cir.2004)). The first requires the plaintiff to show that "defendant[s] deliberately sought to deprive [plaintiff] of the equal protection of the laws for reasons of a personal nature unrelated to the duties of the defendants' position." *Hilton v. City of Wheeling*, 209 F.3d 1005, 1008 (7th Cir.2000). Plaintiff has not alleged that any defendant defrauded it for reasons of a personal nature. The second type of "class of one" claim exists when a defendant treats the plaintiff differently from other persons similarly situated and does so intentionally and for no rational reason. *Crowley*, 400 F.3d at 972; *Tuffendsam*, 385 F.3d at 1128. Plaintiff has not pointed to any other similarly situated entity that defendants have treated differently. Because plaintiff's alleged facts do not fit either standard, I will dismiss plaintiff's equal protection claim.

### 2. *Due process*

Plaintiff contends that it has stated a substantive due process claim by alleging that defendants deprived it of its

property arbitrarily and irrationally and that no adequate state law remedies were available. In support of its argument, plaintiff cites *Contreras v. City of Chicago*, 119 F.3d 1286, 1295 (7th Cir.1997), in which the court of appeals stated that "a plaintiff bringing a substantive due process claim predicated on a deprived property interest must show 1) that the state's decision was arbitrary and irrational, and 2) that the state committed a separate constitutional violation or that state law remedies are inadequate." This pleading standard appears to have originated from the court of appeals' holding in *Kauth v. Hartford Insurance Co. of Ill.*, 852 F.2d 951 (7th Cir.1988), in which the court noted that even though "[c]ourts often apply a substantive due process analysis when a plaintiff's property rights are impaired by a statute or regulation," it was far less clear that substantive due process applied to arbitrary property deprivations by state actors. *Id.* at 956. Although expressing reservation in light of its earlier pronouncement that substantive due process does not protect state-created property interests, the court acknowledged that the United States Supreme Court appeared to have tacitly recognized that it might in *Regents of the Univ. of Michigan v. Ewing*, 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985). *Kauth*, 852 F.2d at 957. Without more explicit direction from the Supreme Court, however, the court of appeals refused to "adopt a characterization of substantive due process that could effectively undermine established Supreme Court precedent requiring plaintiffs complaining of arbitrary deprivations of their property to seek redress through state remedies" and thus held that a party claiming an arbitrary deprivation of a state-created property interest must allege a violation of some other substantive constitutional right or the inadequacy of available state remedies in order to make out a substantive due process claim. *Id.* at 957–58.

It is not clear whether this rule applies only to claims that a state actor has deprived a party of a *state-created* property interest. Typically, the standard is applied in a limited class of cases, *see, e.g., Snyder v. Nolen*, 380 F.3d 279, 298 n. 2 (7th Cir.2004) (Ripple, J., dissenting); *Veterans Legal Defense Fund v. Schwartz*, 330 F.3d 937, 941–42 (7th Cir.2003) (deprivation of civil service hiring preference); *Strasburger v. Bd. of Educ., Hardin Co. Community Unit School District No.1*, 143 F.3d 351, 357 (7th Cir.1998) (government employment); *Wudtke v. Davel*, 128 F.3d 1057, 1062 (7th Cir.1997) (government employment); *Contreras*, 119 F.3d at 1294–95 (restaurant license); *Doherty v. City of Chicago*, 75 F.3d 318, 325 (7th Cir.1996) (denial of amusement license and zoning certificate); *New Burnham Prairie Homes, Inc. v. Vill. of Burnham*, 910 F.2d 1474, 1480 (7th Cir.1990) (building permit denial), but the court has never stated this limitation expressly and exceptions exist, *see, e.g., Gable v. City of Chicago*, 296 F.3d 531, 541 (7th Cir.2002) (property interest in use and integrity of vehicles); *Holstein v. City of Chicago*, 29 F.3d 1145, 1148–49 (7th Cir.1994) (property interest in car). Of more fundamental concern is that this standard creates some tension with the general rule that substantive due process is concerned with government action that is inappropriate regardless of the fairness of the procedures used; typically, claims of property deprivation without adequate state law remedies would sound in procedural due process. *Zinermon v. Burch*, 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990); *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (substantive component of the due process clause "bar[s] certain government actions regardless of the fair-

ness of the procedures used to implement them").

The confusion arising from this line of cases appears to stem at least in part from the lack of guidance provided by the Supreme Court as to what, if any, protection substantive due process provides against arbitrary property deprivations. *Contreras*, 119 F.3d at 1294; *Doherty*, 75 F.3d at 325; *Holstein*, 29 F.3d at 1148–49. In those cases in which the court of appeals has addressed the standard set out in *Kauth*, plaintiffs have failed to plead or prove either an independent substantive constitutional violation or inadequate state law remedies, making it unnecessary for the court of appeals to answer the question definitively. *Gable*, 296 F.3d at 541; *Strasburger*, 143 F.3d at 357–58; *Wudtke*, 128 F.3d at 1062; *Contreras*, 119 F.3d at 1295; *Doherty*, 75 F.3d at 326; *Holstein*, 29 F.3d at 1149; *New Burnham Prairie Homes*, 910 F.2d at 1481. In this case as well, the issue can be put off for yet another day. Like the plaintiffs in the cases just cited, plaintiff has not alleged any other substantive constitutional violation and it had adequate state law remedies. Plaintiff's due process claim fails whether it is characterized as substantive or procedural.

Plaintiff does not contend that its allegations implicate another substantive constitutional right, but it has raised two arguments in support of its assertion that it had no adequate state law remedy for its damages. First, it contends that "state law remedies are inadequate to address [its] claims and damages because Defendants' position of authority and manipulation of government bodies and processes." Plt.'s Second Am. Cpt., dkt. # 69, at 35, ¶ 116. However, plaintiff does not suggest that any defendant had any power or authority to influence the actions of the Wisconsin state court system, which is where plaintiff would normally file a tort or breach of contract action.

Plaintiff's second argument is that it has no real state court remedies because its ability to recover under state law would be limited by Wisconsin's statutory cap limiting damages recoverable in tort actions against governmental subdivisions or agencies and their officers and agents to $50,000, Wis. Stat. § 893.80(3), and by Wis. Stat. 893.80(4), which provides that "[n]o suit may be brought against any ... governmental subdivision or an agency thereof for the intentional torts of its officers, officials, agents or employees." (Plaintiff alleges that its actual damages exceed $900,000). The fact that a plaintiff "might not be able to recover under [state law] remedies the full amount which he might receive in a § 1983 action is not ... determinative of the adequacy of the state remedies." *Hudson v. Palmer*, 468 U.S. 517, 535, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). "[U]nless the remedy which an injured party may pursue in state court can readily be characterized as inadequate to the point that it is meaningless or nonexistent," courts should not ignore the Supreme Court's warning that the Fourteenth Amendment should not be treated as a " 'font of tort law to be superimposed upon whatever systems may already be administered by the States.' " *Easter House v. Felder*, 910 F.2d 1387, 1404–06 (7th Cir.1990) (quoting *Parratt v. Taylor*, 451 U.S. 527, 544, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981)).

Plaintiff does not suggest that $50,000 is a meaningless or nonexistent remedy. *Cf. Hamlin v. Vaudenberg*, 95 F.3d 580 (7th Cir.1996) (even though inmate could not recover money through inmate complaint review system, proceedings neither meaningless nor nonexistent and therefore constitutionally sufficient). The limitation in Wis. Stat. § 893.80(4) would not prevent

plaintiff from recovering $50,000; it applies only to intentional tort claims and places no limitations on plaintiff's ability to sue the individual defendants. Accordingly, plaintiff's due process claim will be dismissed.

### C. State Law Claims

#### 1. Jurisdiction

■■■ Plaintiff's three remaining claims arise under state law. Because plaintiff and defendants are citizens of the same state, diversity jurisdiction does not exist. 28 U.S.C. § 1332. However, there may be supplemental jurisdiction for those claims "that are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). The second amended complaint outlines three breach of contract claims:

125. Defendants breached the covenants of good faith in dealing with Plaintiff in both their inducement of Plaintiff to enter into the FBO Agreement and in inducing Plaintiff to continue its good faith performance of its obligations under the FBO Agreement.

126. Defendants breached the express contract covenants and obligations as set forth in the FBO Agreement by allowing airplane maintenance to be performed at the airport by nonqualified and contractually prohibited individuals and businesses.

127. Defendants breached the FBO Agreement by failing to maintain and replace the aviation fuel system and underground tanks located at the Airport pursuant to the FBO Agreement and consequently deprived Plaintiff of fuel sale opportunities until such time as Plaintiff installed its own fuel system and operations at substantial cost and expense.

Plt.'s Second Am. Cpt., dkt. # 69, at 36, ¶¶ 125–27. The second and third claims do not share a common nucleus of operative facts with plaintiff's federal RICO and § 1983 claims. Resolution of these claims would require an evaluation of the terms of the contract and defendants' conduct in allowing unqualified individuals to perform aircraft maintenance and in failing to maintain an aviation fuel tank; none of these issues have any bearing on the federal claims alleged. Thus, there is no supplemental jurisdiction over these two contract claims. (Because plaintiff's first contract claim arises out of the same facts as plaintiff's fraud claims, I will assume that there is supplemental jurisdiction over it. However, I note that "there is no duty to bargain in good faith over the terms of a contract." *First National Bank of Chicago v. Atlantic Tele–Network Co.*, 946 F.2d 516, 520 (7th Cir.1991).)

■■■ With respect to plaintiff's claims that defendants violated the Wisconsin Organized Crime Control Act, committed common law fraud claim and conspired to commit fraud, defendants do not contest supplemental jurisdiction. In addition, there is supplemental jurisdiction over plaintiff's first contract claim. However, this does not mean that the jurisdiction must be exercised. When a court dismisses all of the federal claims before trial, the normal course is to relinquish jurisdiction over supplemental law claims; this practice is "based on legitimate and substantial concern with minimizing federal intrusion into areas of purely state law." *Khan v. State Oil Co.*, 93 F.3d 1358, 1366 (7th Cir.1996) *vacated on other grounds*, 522 U.S. 3, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997); *see also Chicago v. International College of Surgeons*, 522 U.S. 156, 173, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997) ("pendent jurisdiction is 'a doctrine of discre-

tion, not of plaintiff's right'") (quoting *Gibbs*, 383 U.S. at 726, 86 S.Ct. 1130).

The presumption of relinquishment is rebuttable when a party shows that judicial economy, convenience, fairness and comity tip the balance in favor of federal decision of state law issues. *Wright v. Associated Insurance Cos. Inc.*, 29 F.3d 1244, 1251 (7th Cir.1994). Plaintiff contends that is the situation in this case; it notes that in the two years that this case has been pending in federal court, substantial judicial resources have been expended and the statute of limitations for its state law claims has run. Neither of these arguments is persuasive. The judicial resources that have been spent in this case are not related to plaintiff's state law claims; neither this court nor the court of appeals has considered the merits of the supplemental law claims.

■■■ As for plaintiff's concern about the running of the statutes of limitations of its state law claims, 28 U.S.C. § 1367(d) provides that the period of limitations for any supplemental law claim "shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period." (This provision applies to all cases commenced after December 1, 1990; the cases plaintiff cites predate the enactment of the supplemental jurisdiction statute). Although the tolling provision is unconstitutional when applied to claims brought against states that are dismissed on sovereign immunity grounds, *Raygor v. Regents of University of Minn.*, 534 U.S. 533, 122 S.Ct. 999, 152 L.Ed.2d 27 (2002), it is constitutional when applied to claims against political subdivisions of a state that are dismissed when a federal district court declines to exercise supplemental jurisdiction, *Jinks v. Richland County*, 538 U.S. 456, 123 S.Ct. 1667, 155 L.Ed.2d 631 (2003). As the Court reasoned in *Jinks*,

§ 1367(d) does not encroach upon state sovereign immunity when applied to actions against political subdivisions because "municipalities, unlike States, do not enjoy a constitutionally protected immunity from suit." *Id.* at 466, 123 S.Ct. 1667. Plaintiff's state law claims are brought against a municipality and its officers. Thus, § 1367(d) lawfully tolls the applicable statutes of limitation periods. Unless plaintiff fails to file its state law claims in state court within thirty days of dismissal, it will not suffer any prejudice on the statute of limitations issue.

With the dismissal of all of the federal claims and plaintiff's failure to show that judicial economy or fairness weigh in favor of federal court resolution, I will decline to exercise supplemental jurisdiction over plaintiff's claims that defendants violated the Wisconsin Organized Crime Control Act, committed common law fraud claim, conspired to commit fraud and breached their duty of good faith and fair dealing by inducing plaintiff to enter and continue performing under the fixed base operator contract. (The parties should note that § 1367's tolling provision applies only to claims for which the court has supplemental jurisdiction. It does not apply to plaintiff's claims that defendants breached the parties' contract by allowing unqualified individuals perform airplane maintenance and by failing to maintain and replace the aviation fuel system and underground tanks because these claims are not part of the same case or controversy as its federal claims. Although this may mean that plaintiff will be time barred from bringing the contract claims in state court, it is not within this court's discretion to exercise jurisdiction over those claims.)

### D. *Leave to Amend*

■■■ Finally, I turn to the question whether plaintiff should be granted leave to file a third amended complaint. Defendants suggest that it is clear on the face of

plaintiff's second amended complaint that the statute of limitations has run on plaintiff's federal claims. However, the relevant facts alleged are not materially different from those on which the court of appeals relied in remanding the case to reconsider whether the relevant limitation periods had run. *Barry Aviation,* 377 F.3d at 688–90. (The court did not hold that plaintiff's claims are not time-barred, only that there might be some possibility that the limitation periods had not expired. It is entirely plausible that defendants could prove that plaintiff should have known of its own disappointing levels of business within the first three years of its business operations or that defendants' alleged concealment of records could not have prevented plaintiff from learning that the annual number of take-offs and landings at the airport was nearer 500 than 10,000 when plaintiff was on-site the entire time. One would think that someone working for plaintiff might have noticed that take-offs and landings were averaging only 1 to 2 a day, rather than 27. Nonetheless, as the court noted, the running of a statute of limitations is an affirmative defense and may be resolved in reliance on the allegations of a complaint only where a plaintiff has effectively admitted that its claims are time-barred. *Barry Aviation,* 377 F.3d at 688.)

■ Although I will not deny plaintiff leave to amend on statute of limitations grounds, I will deny it leave on the ground that plaintiff has had three opportunities to state its claims and has been unable to do so. The court of appeals has held that it is not an abuse of discretion to refuse to grant leave to amend to a litigant who has had three chances over the course of several years to state a viable federal claim, even where the deficiencies of the complaint might be cured by further pleading. *Emery v. American General Finance, Inc.,* 134 F.3d 1321, 1322–23 (7th Cir.1998); *see also Midwest Grinding,* 976 F.2d at

1020–21 (firmly within district court's discretion to deny plaintiff leave to file third amended complaint). A party's repeated failure to cure deficiencies is a ground for denying leave to amend. *Garner v. Kinnear Manufacturing Co.,* 37 F.3d 263, 269 (7th Cir.1994).

In moving to dismiss plaintiff's first amended complaint, defendants pointed out to plaintiff that (1) Rule 9(b) applies to allegations of mail and wire fraud in a RICO case; (2) the other acts of wrongdoing plaintiff alleged did not qualify as RICO predicate acts; (3) equal protection requires a showing that one class has been treated differently from another; and (4) Wisconsin's provision of remedies for plaintiff's injuries precludes a due process claim. Plaintiff sought leave to amend its first amended complaint in order to address *certain* issues raised by defendant's motion to dismiss. Although I granted plaintiff this opportunity, its second amended complaint fails to cure the deficiencies that defendants pointed out. As I noted above, plaintiff's multiple pleadings and other filings suggest that it does not take seriously its obligation to research its fraud claims thoroughly enough to satisfy Rule 9(b)'s particularity requirements. *Ackerman,* 172 F.3d at 469. As a result, defendants have been put to considerable effort and expense defending itself from faulty pleadings.

Plaintiff's § 1983 claims are substantively flawed; the conduct about which plaintiff complains does not raise questions of equal protection and due process. It is unlikely that allowing plaintiff another opportunity would cure this defect. Accordingly, I will deny plaintiff leave to amend.

## ORDER

IT IS ORDERED that

1. Plaintiff Barry Aviation, Inc.'s motion for oral argument is DENIED as unnecessary;

2. The motion of defendants Land O'Lakes Municipal Airport Commission, Town of Land O'Lakes Wisconsin, Richard Peterson, Henry Mitchell, Michael Stopczyski, Ronald Ramesh, Karl Kersher and James A. Bates to dismiss plaintiff's second amended complaint is GRANTED without leave to amend and plaintiff's claims are DISMISSED without prejudice; and

3. The clerk of court is directed to enter judgment in favor of defendants and close this case.